IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

CARL COX                                                                               PLAINTIFF

VS.                                CIVIL NO. 06-5057

LINDA S. MCMAHON, COMMISSIONER
SOCIAL SECURITY ADMINISTRATION                                DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

      Plaintiff, Carl Cox, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the provisions of Titles II and XVI of the Social Security Act ("Act").

**Procedural Background:**

      The applications for DIB and SSI now before this court were filed on May 9, 2003, and March 2, 2004, respectively, alleging an onset date of December 20, 2000, due to neck, back, left arm, and left shoulder pain. (Tr. 78, 104, 113). An administrative hearing was held on May 4, 2004. (Tr. 31, 415). The ALJ issued an unfavorable decision on July 30, 2004. (Tr. 38). However, on October 23, 2004, the Appeals Council granted jurisdiction and remanded the case back to the ALJ for further action. (Tr. 64-65). Specifically, the Appeals Counsel requested that the ALJ give further consideration to the claimant's maximum RFC and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations, as well as obtain vocational evidence regarding the impact of plaintiff's nonexertional limitations on his ability to perform jobs remaining in the national economy. A supplemental administrative hearing was held on August 2, 2005. (Tr. 439, 441). Plaintiff was present and represented by counsel.

At the time of the supplemental administrative hearing, plaintiff was fifty-four years old and possessed a ninth grade education. (Tr. 355). The record reveals that he had past relevant work ("PRW") experience as the owner of a lawn service business and greenhouses. (Tr. 12).

On September 1, 2005, the Administrative Law Judge ("ALJ"), issued a written decision finding that plaintiff's impairments were severe impairments. (Tr. 19). However, he concluded that these impairments did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. After discrediting plaintiff's subjective allegations, he determined that plaintiff retained the residual functional capacity ("RFC") to perform a significant range of light[1] work limited by his ability to only use his left arm to carry substantially less than ten pounds and inability to use his left hand for fine manipulation or grasping. With the assistance of a vocational expert ("VE"), the ALJ determined that plaintiff could still perform work as a counter clerk, information clerk, and interviewer. (Tr. 20).

On March 18, 2006, the Appeals Council declined to review this decision. (Tr. 3-5). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned for report and recommendation. Both parties have filed appeal briefs, and the case is now ready for decision. (Doc. # 9, 10).

---

[1] We note that the ALJ's opinion states that plaintiff can perform a range of sedentary work. However, the RFC actually described by the ALJ is that of light work with additional non-exertional limitations. *See* 20 C.F.R. § 404.1567 (b). We find this to be an error in opinion writing technique, rather than reversible error. *See Johnson v. Apfel,* 240 F.3d 1145, 1145 (8th Cir. 2001) (holding that a deficiency in the opinion-writing technique does not require court to set aside a finding that is supported by substantial evidence).

**Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents his from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. §§ 404.1520(a)- (f)(2003), 416.920. Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schwieker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. §§ 404.1520, 416.920 (2003).

**Evidence Presented**:

On August 4, 2000, records indicate that plaintiff was suffering from gastroesophageal reflux disorder ("GERD"), benign hypertension, insomnia, hemorrhoids status post hemorrhoidectomy, and chronic blood loss due to anemia. (Tr. 257). For these complaints, plaintiff had been prescribed Ranitidine, Atenolol, Hydroxyzine, and Xanax. (Tr. 258).

In December 2000, plaintiff was going out to his mail box when he slipped and fell, fracturing his left shoulder. (Tr. 446). X-rays taken on December 22, 2000, demonstrated that plaintiff experienced a comminuted fracture involving the left humeral head and neck of the left shoulder with mild displacement along the fracture plane absent evidence of mal-alignment. (Tr. 255-56). A CT scan of plaintiff's left shoulder performed on December 27, 2000, confirmed the comminuted fracture of the proximal left humerus involving the greater and lessor tuberosity with displaced bony fragments and hematoma of the adjacent anterior musculature. (Tr. 254-55).

On December 29, 2000, plaintiff underwent an open reduction with internal fixation. (Tr. 374, 379). The surgery was performed by Dr. Christopher A. Arnold. (Tr. 374, 379). Followup examinations by Dr. Arnold on January 8, 2001, and January 22, 2001, revealed good alignment with satisfactory healing of the shoulder. (Tr. 368-72).

On January 29, 2001, plaintiff presented for a follow-up appointment with his primary care physician. (Tr. 244). His arm remained in an immobilizer and he was reportedly doing physical therapy three times per week. Plaintiff indicated that he was feeling "blue" due to his recent surgery but also stated that he always felt worse in the winter. He asked Dr. Clark Flanary if he could "get anything" for this. Dr. Flanary prescribed Zoloft. (Tr. 246).

On February 12, 2001, Dr. Arnold strongly recommended plaintiff undergo physical therapy consisting of range of motion exercises, as well as home exercises, so that plaintiff's left shoulder and arm would not become permanently stiff. (Tr. 366-68). During this time period, plaintiff sought follow-up care with the Veteran's Administration (VA).

X-rays dated March 7, 2001, revealed callus formation around the proximal humerus where the fractures occurred, as well as one fixation screw present through the greater tuberosity of the humerus directed down across the fracture and into the shaft of the humerus. (Tr. 226). An exam revealed some patchy numbness in the axillary nerve distribution but plaintiff seemed to be firing the deltoid muscle. As such, Dr. Oscar Henderson opined that the axillary nerve appeared to be intact. He recommended that plaintiff aggressively pursue physical therapy and return for a follow-up in one month. (Tr. 226). Over the next several months, plaintiff participated in physical therapy. (Tr. 226-233, 238-39).

On April 4, 2001, a follow-up exam revealed that plaintiff had deltoid muscle function and axillary nerve function. (Tr. 223). However, he still had some patchy numbness in the axillary distribution. X-rays showed continued healing of the fractures with one fixation screw, a long cannulated screw, into the greater tuberosity humerus down across the fracture site into the distal fragment medially. The hardware was also noted to be in good position with no evidence of hardware failure.

On April 11, 2001, physical therapy notes revealed that plaintiff appeared to have been "less than satisfactory with compliance" of his home exercise program. (Tr. 221). He had an overall gain in range of motion of only twenty-four degrees. Then, on May 2, 2001, plaintiff failed to attend a follow-up appointment and had no further scheduled appointments. As such, physical therapy was unable to accurately assess his goals. (Tr. 221).

On May 14, 2001, plaintiff requested an orthopaedic appointment at the VA due to left knee pain and swelling. (Tr. 215). Another request for an orthopaedic appointment for plaintiff's left knee was made on May 21, 2001. (Tr. 210, 214). However, x-rays taken of the left knee on May 22, 2001, were normal. (Tr. 224).

On July 10, 2001, progress notes reveal that plaintiff continued to experience discomfort with improvement. (Tr. 214). He indicated that his range of motion was still limited. (Tr. 215). X-rays revealed that a screw was left in place after the initial surgery to stabilize the fracture. (Tr. 208, 215). A medical notation indicated that the screw could be removed when time permitted. (Tr. 214).

By October 22, 2001, plaintiff was still complaining of residual painful symptoms and a limited range of motion in his left shoulder, despite physical therapy. (Tr. 198). He also reported continued left knee pain and swelling, in spite of his medications. (Tr. 210). He indicated that he

6

could hardly walk on the leg. Records indicate that plaintiff had a history of high blood pressure controlled with medication. (Tr. 198). A musculoskeletal examination found that plaintiff exhibited equal strength (five out of five) in the upper and lower extremities, as well as normal reflexes. (Tr. 200). In addition, he was found to be neurologically intact. (Tr. 200). Plaintiff was also alert and oriented to his surroundings. (Tr. 200). He did, however, exhibit some pain upon range of motion in the left arm. (Tr. 200). VA medical personnel felt that plaintiff's residual painful symptoms could be due to the hardware (the screw) that was used to set and stabilize his fracture. (Tr. 198). Consequently they decided to surgically remove the hardware. (Tr. 198).

On November 5, 2001, plaintiff underwent surgery to remove the loose hardware. (Tr. 197). A chest x-ray revealed a stable two centimeter nodule within the right mid-lung anteriorly. (Tr. 209).

Two weeks later, plaintiff was seen for a routine follow-up examination at the VA. (Tr. 191). His shoulder was noted to be quite stiff with a limited range of motion. Dr. Henderson instructed him to perform his daily exercises in order to regain shoulder mobility and strength. (Tr. 191).

On February 27, 2002, x-rays of the left shoulder were taken and demonstrated complete consolidation of his fracture with no evidence of dislocation and no significant signs of traumatic arthritis. (Tr. 187). Additionally, there was no interval change in the alignment and position of plaintiff's left proximal humerus. (Tr. 188). Plaintiff was again instructed to continue with his daily exercise program. (Tr. 189, 191).

Follow-up x-rays of plaintiff's left shoulder taken on June 22, 2002, failed to reveal any significant change from the x-rays performed in February. (Tr. 182). The x-rays did, however, reveal marked deformity of the left proximal humerus secondary to posttraumatic and post-surgical changes. An examination also revealed a marked decrease in range of motion in the shoulder. (Tr.

175). Dr. Henderson advised plaintiff to continue to moderate his activities and use Vicodin judiciously for pain control. Aside from the possibility of fusion or joint replacement surgery, Dr. Henderson was of the opinion that plaintiff would not benefit from additional surgeries. (Tr. 175).

On November 7, 2002, plaintiff complained of left shoulder pain. (Tr. 334). X-rays revealed significant degeneration of the left proximal humerus consistent with avascular necrosis along with glenoid articular irregularity. An aspiration arthrogram could not be completed because radiology was unable to penetrate to the joint space due to bone overgrowth. As such, plaintiff was scheduled for a CT scan and preparation for a left total shoulder arthroplasty. (Tr. 334). The CT scan of plaintiff's left shoulder performed on December 19, 2002, revealed findings consistent with post-traumatic changes with findings worrisome for superimposed avascular necrosis. (Tr. 171).

On March 21, 2003, plaintiff successfully underwent a prosthetic replacement of his left total shoulder (left humeral head). (Tr. 301-305, 322). After the surgery, plaintiff was prescribed passive assist physical therapy for three months. (Tr. 300-301, 400-401).

On May 1, 2003, Dr. David Paladino noted that plaintiff was doing well. (Tr. 300). However, he continued to complain of dull, aching pain in the shoulder. Although x-rays indicated good alignment of the prosthesis with no evidence of loosening, an examination revealed a continued decreased range of motion in the shoulder. As such, Dr. Paladino referred plaintiff to physical therapy to begin home active and passive range of motion exercises. (Tr. 300).

On June 12, 2003, progress notes revealed that plaintiff was generally doing well. (Tr. 295). His chief complaint was dull, aching pain in his shoulder, especially after passive range of motion. X-rays continued to indicate good alignment of the prosthesis with no evidence of loosening, however, an examination revealed atrophy of the anterior deltoid muscle. Plaintiff was referred to

physical therapy to begin a home strengthening program. Records indicate that plaintiff was able to properly demonstrate the exercises and was released from physical therapy on a referral basis to only be seen following orthopaedic exams. (Tr. 295, 396).

On February 2, 2004, an examination revealed atrophy of the anterior aspect of the deltoid but good strength on testing in the posterior and middle deltoid. (Tr. 386). Plaintiff also had a good external range of motion and internal rotation strength. X-rays continued to show good alignment of the prosthesis with no evidence of loosening. However, plaintiff remained limited with regard to overhead activities. Plaintiff's treatment options were explained to him and plaintiff indicated that he was not interested in further surgery at that time. He indicated that he was doing "relatively okay." (Tr. 387).

On February 5, 2004, Dr. Collins noted a muscular deficit in the region of the original incision and a visible and palpable deformity of the deltoid. (Tr. 387). He also indicated that the deltoid was contractile with integument sensory changes in the region of the incisions. Plaintiff was able to hold his arm up at approximately forty-five degrees but could not hold it any higher. (Tr. 387-388). Further, Dr. Collins stated that plaintiff had lost function in or was not able to function well with his left shoulder. He noted that more stability might come with muscular tenderness transposition, including pectoralis major, but that it would be difficult to predict. Dr. Collins indicated that anterior and superior scapula was certainly one of the more difficult and challenging problems associated with shoulder implant arthroplasty. (Tr. 388).

At this time, plaintiff was noted to be suffering from depression, left shoulder pain, actinic keratosis[2] on the forehead, GERD, and hypertension. (Tr. 391). His medications were said to include Alprazolam, Atenolol, Bupropion, and Doxycycline. (Tr. 391).

On April 18, 2005, plaintiff underwent a consultative physical examination with Dr. Alice Martinson, an orthopaedist. (Tr. 409-410). An examination revealed marked atrophy of the anterior portion of the left deltoid with no palpable contraction in that muscle segment with attempted abduction of the shoulder. He had seventy degrees of active shoulder motion, fifty degrees of abduction, twenty degrees of internal rotation, and zero degrees of external rotation. X-rays showed the humeral head prosthesis with a somewhat enlarged proximal humerus but no evidence of loosening. (Tr. 410). Dr. Martinson opined that plaintiff had marked permanent impairment of his shoulder. She indicated that his shoulder weakness was due in large part to paralysis of the anterior portion of the left deltoid. Judging from his surgical scar, Dr. Martinson stated that it likely represented the consequences of an axillary nerve injury which occurred at the tine of his prosthetic arthroplasty. As such, she assigned him a total body impairment rating of fifteen percent. Dr. Martinson found that plaintiff could frequently lift up to ten pounds, occasionally lift eleven to twenty pounds, occasionally push/pull/operate hand controls with the left arm, never reach with the left arm, never climb, never kneel, and never crawl. (Tr. 411). She also stated that plaintiff could sit, stand, and walk for eight hours during an eight-hour workday. (Tr. 411).

---

[2]Actinic Keratosis is a precancerous skin growth usually caused by sun exposure. *Actinic Keratosis*, *at* www.nlm.nih.gov/medlineplus.

**Discussion:**

We first address the ALJ's assessment of plaintiff's subjective complaints. The ALJ was required to consider all the evidence relating to plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. *Id*. As the United States Court of Appeals for the Eighth Circuit recently observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

Plaintiff has alleged disability due to neck, back, left arm, and left shoulder pain. (Tr. 78, 104, 113). At the onset, we note that the evidence does indicate that plaintiff has undergone an open reduction with internal fixation and a prosthetic replacement of his left shoulder. As a result, plaintiff continues to suffer from atrophy and a decreased range of motion in this extremity. However, Dr. Martinson has rated plaintiff's total body impairment to be only fifteen percent. Records indicate that plaintiff is right hand dominant. Plaintiff neither complained of nor is there any evidence of any impairments involving his right hand or arm. As such, while we agree with the ALJ's conclusion that plaintiff can do no more than occasionally lift substantially less than ten with this arm and can not use his left hand for gripping or fine manipulation, we cannot say that these limitations totally disable the plaintiff.

We also note that plaintiff testified that he was taking Hydrocodone and Ibuprofen for pain, as well as an anti-hypertensive to treat his high blood pressure. (Tr. 450). Although he reported that the Hydrocodone made him "real slow," we can find no evidence to show that plaintiff reported this side effect to his doctors. *See Zeiler v. Barnhart*, 384 F.3d 932, 936 (8th Cir. 2004) (alleged side effects were properly discounted when plaintiff did not complain to doctors that her medication made concentration difficult). In fact, plaintiff continues to take this medication and is able to perform a variety of household chores and activities. As such, we cannot say that the side effects of plaintiff's medications renders him disabled.

Plaintiff also contends that he suffered from pain in his leg. However, we note that x-rays and an examination conducted in 2001 revealed no abnormalities. *See Baldwin v. Barnhart*, 349 F.3d 549, 558 (8th Cir. 2003)(subjective complaints of pain properly discounted by ALJ, particularly in light of the lack of objective findings despite repeated consultative and claimant initiated medical examinations). Further, plaintiff has failed to seek consistent treatment for this alleged impairment. *See Edwards v. Barnhart*, 314 F.3d at 967 (holding that ALJ may discount disability claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment). The record reveals only two occasions when plaintiff was treated for this complaint. Had plaintiff's leg pain been as severe as alleged, we believe plaintiff would have sought more consistent treatment.

We are also cognizant of the fact that plaintiff has previously been diagnosed with depression. (Tr. 167, 195, 206, 219, 228, 234, 392). From the record, though, it appears as if plaintiff's depression was situational and related to his pain and/or the season of the year, rather than a mental illness or defect. (Tr. 228, 244). For this, the doctors periodically prescribed anti-depressants. (Tr. 167, 195, 206, 219, 227, 234, 244, 392). However, we can find no evidence to show that plaintiff

sought ongoing treatment for this condition. *See Jones v. Callahan*, 122 F.3d 1148, 1153 (1997) (holding that ALJ properly concluded claimant's mental impairment was not severe where he was not undergoing regular mental health treatment or regularly taking psychiatric medications). In fact, at times, the evidence reveals that plaintiff did not meet the screening criteria for depression. (Tr. 175, 181, 187, 190, 213). A mere diagnosis is not disabling per se, there must be a functional loss establishing an inability to engage in substantial gainful activity before disability occurs. *See Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990). Because the evidence does not indicate any functional loss as a result of plaintiff's situational depression, we find that the ALJ's conclusion that plaintiff's depression was non-severe is supported by substantial evidence. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001) (claimant's failure to attend counseling, her daily activities, and intake notes demonstrate that her depression was situational); *see also Hutton v. Apfel*, 175 F.3d 651, 655 (8th Cir. 1999) (failure of claimant to maintain a consistent treatment pattern for alleged mental impairments is inconsistent with the disabling nature of such impairments).

There is also no evidence to suggest that plaintiff has additional medical documentation of his depression. "'[R]eversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial.'" *Shannon,* 54 F.3d 484, 488 (quoting *Onstad v. Shalala,* 999 F.2d 1232, 1234 (8th Cir.1993)). Plaintiff has made no such showing. As such, plaintiff's argument that the ALJ should have developed the record further with regard to his mental limitations must fail.

Plaintiff's own reports concerning his activities of daily living also provide support for a finding that plaintiff is not disabled. First, in April 2001, plaintiff reported that he had returned to work briefly at his lawn care service and had not been compliant with his physical therapy regimen. (Tr. 105, 225, 444-45). Plaintiff also told Dr. Martinson, in 2005, that he worked in the lawn care

service and was only able to perform limited light-effort jobs in that capacity during the prior summer (2004). (Tr. 409). Work at the less than substantial gainful activity level may still be determinative of plaintiff's capacity for work after his alleged disability onset date. *See Starr v. Sullivan*, 981 F.2d 1006, 1009 n.3 (8th Cir. 1992); 20 C.F.R. § 404.1571.

In addition, on a supplemental interview outline dated July 22, 2003, plaintiff reported an ability to take care of his personal needs via the use of one hand and "with great difficulty," wash dishes, take out the trash, water the garden, shop for groceries with help, prepare simple meals, pay bills, use a check book, count change, walk for exercise, watch television, listen to the radio, read, and visit with friends and relatives (in a limited capacity). (Tr. 129-130). In fact, at the second administrative hearing, plaintiff testified that he could lift ten pounds and use a weed eater (trimmer) on the back yard, under the fences, and around the flower bed. (Tr. 15, 129, 453, 455). He also indicated that he could use a riding lawn mower utilizing one arm. (Tr. 15, 452). *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor).

Therefore, although it is clear that plaintiff suffers from some degree of pain, he has not established that he is unable to engage in any and all gainful activity. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not

mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled). Neither the medical evidence nor the reports concerning his daily activities support plaintiff's contention of total disability. Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were not totally credible.

We can also find no reason to discount the ALJ's decision to dismiss the testimony of plaintiff's wife, Holly Cox. (Tr. 244-246). It is clear that her testimony merely corroborated plaintiff's testimony. As such, the same evidence that supported discounting plaintiff's testimony also supported discounting the testimony of this witness. *Wheeler v. Apfel*, 224 F.3d 891, 896 (8th Cir. 2000). Mrs. Cox also had a financial interest in the outcome of the case. *Ownbey v. Shalala*, 5 F.3d 342, 345 (8th Cir. 1993). Because the determination as to the weight given to witness statements was clearly within the ALJ's province, we find no error in his credibility determination. *See Siemers v. Shalala*, 47 F.3d 299, 302 (8th Cir. 1995) (citing *Basinger v. Heckler*, 725 F.2d 1166, 1170 (8th Cir.1984), which held that the ALJ is free to disbelieve the testimony of the claimant and his witnesses)); *Ownbey*, 5 F.3d at 345.

Plaintiff also contends that the ALJ erred in finding that he maintained the RFC to perform a range of light work. It is well settled that the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000). The United States Court of Appeals for the Eighth Circuit has also stated that a "claimant's residual functional capacity is a medical question," *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000), and thus, "some medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam ), must support the determination of the plaintiff's RFC, and the ALJ should

obtain medical evidence that addresses the claimant's "ability to function in the workplace." *Nevland v. Apfel*, 2 04 F.3d 853, 858 (8th Cir. 2000). Therefore, in evaluating the plaintiff's RFC, *see* 20 C.F.R. § 404.1545(c), while not limited to considering medical evidence, an ALJ is required to consider at least some supporting evidence from a professional. *Cf. Nevland v. Apfel*, 204 F.3d at 858; *Ford v. Secretary of Health and Human Servs.*, 662 F. Supp. 954, 955, 956 (W.D. Ark. 1987) (RFC was "medical question," and medical evidence was required to establish how claimant's heart attacks affected his RFC).

In the present case, the ALJ considered the medical assessments of non-examining agency medical consultants, the RFC assessment of a consultative physician, plaintiff's subjective complaints, and his medical records. On June 11, 2003, Dr. Susan Manley, a non-examining, consultative physician, completed an RFC assessment of plaintiff. (Tr. 348-354). After reviewing plaintiff's medical records, she determined that plaintiff was limited in his ability to reach in all directions with his left arm. (Tr. 349). As such, Dr. Manley concluded that plaintiff could perform light work with restrictions regarding the use of his left upper extremity. (Tr. 354).

On August 25, 2003, Dr. Jerry Thomas, a non-examining, consultative examiner also completed a physical RFC assessment concerning plaintiff. (Tr. 355-363). He reviewed plaintiff's medical records and found that plaintiff could lift twenty pounds occasionally and ten pounds frequently, as well as sit, stand, and walk about six hours during an eight-hour workday. (Tr. 356). Dr. Thomas also noted that plaintiff was restricted with regard to overhead reaching with his left arm. (Tr. 358).

The ALJ also considered Dr. Martinson's findings. While Dr. Martinson noted a fifteen percent permanent impairment rating of plaintiff's left shoulder, she also concluded that he could

frequently lift and carry up to ten pounds, occasionally lift and carry eleven to twenty pounds, as well as sit, stand, and walk for a full eight-hour workday. (Tr. 411). Additionally, Dr. Martinson concluded that plaintiff could occasionally use his left arm to push, pull, and operate hand controls but could not reach. (Tr. 411).

Given the evidence before the ALJ, we conclude that his RFC assessment is supported by substantial evidence. In line with Dr. Martinson's findings, as well as the other medical evidence of record, the ALJ determined that plaintiff could lift ten pounds frequently, lift twenty pounds occasionally, and sit, stand, and walk about eight hours in and eight-hour workday. (Tr. 19). He also concluded that plaintiff could only use his left arm to carry substantially less than ten pounds and could not use his left hand for fine manipulation or grasping.[3] (Tr. 19). In support of this, the ALJ also pointed out plaintiff's ability to use a weed eater and operate a riding lawn mower, in spite of the limitations regarding the use of his left arm.

We also find that substantial evidence supports the ALJ's finding that plaintiff could perform work as a counter clerk, information clerk, and interviewer. (Tr. 19). The ALJ presented the VE with a hypothetical example of an individual of plaintiff's age and education who could lift ten pounds frequently, lift twenty pounds occasionally; sit, stand, and walk about eight hours in and eight-hour workday; occasionally lift substantially less than ten pounds with his left arm; and, could not use their left hand for grasping or fine manipulation. (Tr. 465-467). The VE testified that such

---

[3]We note plaintiff's argument that the ALJ failed to specifically find that plaintiff could not reach and could only occasionally push, pull, or operate hand controls with his left upper extremity. However, after reviewing the ALJ's RFC, it is obvious that these limitations were included in his assessment. The ALJ found that plaintiff could do nothing more than occasionally lift substantially less than ten pounds with his left arm. Clearly, this takes into account plaintiff's inability to use this extremity for any other activities, including, reaching, pushing, pulling, and operating hand controls.

a person could perform the positions of counter clerk, information clerk, and interviewer. As this hypothetical question took into consideration the limitations the ALJ concluded were actually caused by plaintiff's impairments, and which are supported by substantial evidence, the VE's testimony provided substantial evidence to support the ALJ's finding that plaintiff could perform these positions. *See Depover v. Barnhart,* 349 F.3d 563, 568 (8th Cir. 2003) (holding that a VE's response to a properly posed hypothetical question supplied substantial evidence to support ALJ's finding that plaintiff could return to PRW).

Plaintiff's argument that the ALJ's second opinion failed to meet the dictates of the Appeals Council's remand order must also fail. As previously stated, the case was remanded for the ALJ to provide rationale for and references to the evidence of record in support of his RFC assessment, as well as to obtain vocational evidence to support his finding that plaintiff could perform work remaining in the national economy. In his second opinion, the ALJ points to the specific evidence that supports his assessment. (Tr. 33-36). He also provides a sound rationale for his findings. Further, the ALJ called a vocational expert to testify at the supplemental hearing and posed a hypothetical question to the expert that included all of plaintiff's credible limitations. In response to the ALJ's question, the VE testified that plaintiff could still perform work that exists in significant numbers in the national economy, despite his limitations. As such, the ALJ clearly fulfilled the mandates of the remand order.

Plaintiff also contends that the ALJ erred in finding that he could perform the positions of counter clerk, information clerk, and interviewer because these positions are classified as light work, rather than sedentary. However, as previously stated, the ALJ's use of the term sedentary work was a typographical error. He actually assessed plaintiff as being capable of performing a significant

range of light work. A review of the Dictionary of Occupational Titles clearly reveals that each of these positions are rated as either sedentary or light level work. *See* Dictionary of Occupational Titles §§ 166.267-010, 168.267-038, 210.367-010, 249.362-010, 249.366-010, *at* www.westlaw.com. As such, given the ALJ's RFC assessment and the VE's testimony that plaintiff could perform these positions, even with the limitations regarding the use of his left arm, we find plaintiff's argument to be without merit.

**Conclusion:**

Accordingly, we conclude that the ALJ's decision is supported by substantial evidence and recommend that the decision be affirmed and plaintiff's Complaint be dismissed with prejudice. **The parties have ten days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

ENTERED this 5th day of February 2007.

/S/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE